Walter Gary MATTHEWS,
Jr., Appellant,

v.

COMMONWEALTH OF KENTUCKY,
Appellee.

No. 2003–SC–0364–MR.

Supreme Court of Kentucky.

April 21, 2005.

Rehearing Denied Aug. 25, 2005.

Euva D. May, Assistant Public Advocate, Appellate Division, Department of Public Advocacy, Frankfort, Walter Gary

Matthews, Jr., West Liberty, pro se, Counsel for Appellant.

Gregory D. Stumbo, Attorney General of Kentucky, Gregory C. Fuchs, Assistant Attorney General, Criminal Appellate Division, Office of the Attorney General, Frankfort, Counsel for Appellee.

WINTERSHEIMER, Justice.

This appeal is from a judgment based on a jury verdict that convicted Matthews of manufacturing methamphetamine, possession of marijuana, possession of drug paraphernalia and being a first-degree persistent felony offender. He was sentenced to a total of forty-five years in prison.

The questions presented are whether an alleged violation of the Interstate Agreement on Detainers (IAD) required dismissal of this case; whether prosecutorial misconduct occurred; whether the trial judge abused his discretion by failing to hold an evidentiary hearing on the IAD issue; whether Matthews was denied effective assistance of counsel; whether the defendant's confession should have been suppressed; whether Matthews was entitled to a directed verdict on the manufacturing methamphetamine charge; and whether the trial judge erred by failing to hold a *Faretta* hearing before making Matthews co-counsel.

Matthews was arrested following a high speed car chase in Paducah, Kentucky. The car he was driving turned out to be a "rolling meth lab." Matthews was questioned by police and then released on bond. Before he was indicted, his parole on a federal conviction was revoked and he was sent back to prison in Illinois. Matthews was eventually returned to Kentucky and was tried on charges of manufacturing methamphetamine, possession of marijuana, possession of drug paraphernalia and being a first-degree persistent felony offender. He was convicted of all the charges and sentenced to forty-five years in prison. This appeal followed.

I. Interstate Agreement on Detainers

Matthews argues that the trial judge erred by failing to grant his motion to dismiss the indictment based on the Commonwealth's failure to bring him to trial within the 120 days allotted under Article IV of the IAD. We disagree.

When a state initiates a request for temporary custody pursuant to Article IV of the IAD, the trial must begin no later than 120 days from the date the defendant arrives in that jurisdiction. KRS 440.450, Article IV(3). Under Article III, when a defendant requests a final disposition of retainer, the time limit is 180 days from the date of receipt of the prisoner's request. KRS 440.450, Article III(1).

The Commonwealth filed the appropriate form with the holding state of Illinois on September 30, 2002, proposing to bring Matthews to trial within the time specified in Article IV of the IAD, i.e., within 120 days of the prisoner's arrival in the jurisdiction. On October 10, 2002, Illinois sent a letter and the proper forms to Kentucky indicating that Matthews requested disposition of pending charges under Article III of the IAD. Again, that article requires a prisoner to be brought to trial within 180 days after he files the appropriate request.

If the 120–day limit applies, absent other circumstances, Matthews, who arrived at the McCracken County jail on November 6, 2002, should have been tried by March 6, 2003. The trial was ultimately held on March 17, 2003. On the other hand, if the 180–day time limit applies, then Matthews was tried within the time specified.

■ The question before this Court is what time limit applies when both the Commonwealth and the prisoner file docu-

ments to effectuate speedy disposition. Courts across the country have generally taken three different approaches to this issue. The first approach holds that where the defendant initiates Article III proceedings he invariably waives his Article IV rights, including the shorter time limit. *Yellen v. Cooper,* 828 F.2d 1471 (10th Cir.1987); *United States v. Eaddy,* 595 F.2d 341 (6th Cir.1979); *State v. York,* 66 Ohio App.3d 149, 583 N.E.2d 1046 (1990). These cases determine that, as Article IV procedures and Article III procedures are inconsistent, an Article III filing automatically waives those Article IV procedures favorable to the defendant.

The second approach holds that the determining factor is which party first initiates IAD procedures. *State v. Webb,* 570 N.W.2d 913 (Iowa 1997) (Article IV applies where state is first to file after a detainer on the charges is lodged with the other jurisdiction); *Shewan v. State,* 396 So.2d 1133 (Fla.Dist.Ct.App.1980) (180–day limit applied where defendant made Article III request for disposition before State took custody).

The third approach applies both articles when both parties initiate IAD procedures and ascertains which, if any, provisions have been violated in determining which time limit applies. *State v. Willoughby,* 83 Hawai'i 496, 927 P.2d 1379 (Ct.App.1996) (Article IV applies where state was first to file request and Article IV time limit expired first); *State v. Burrus,* 151 Ariz. 572, 729 P.2d 926 (Ct.App.1986) (Article III governs where defendant initiated by letter, state indicated willingness to accept transfer under either Article III or Article IV, and 180–day limit expired first).

Before deciding the proper approach, we must dispel the notion that it is unnecessary for this Court to reach this issue. On December 13, 2002, in open court and without objection by defense counsel, trial in this case was scheduled for March 10, 2003. Thus, it would appear that even if we applied the 120–day time limit, defense counsel's agreement to a trial date outside this IAD period bars the defendant from seeking dismissal on the ground that trial did not occur within that period. *New York v. Hill,* 528 U.S. 110, 120 S.Ct. 659, 145 L.Ed.2d 560 (2000).

The problem here is that on March 6, 2003, the trial judge after "being advised that the trial scheduled in this matter needed to be continued," entered an order continuing the trial until March 17, 2003. There is nothing in the record to indicate whether one of the parties sought the continuance or whether the trial judge acted on his own. *Hill, supra,* does not involve a purported prospective waiver of all protection of the IAD's time limits or of the IAD generally, but merely agreement to a specified delay in trial. That case also observed that the IAD allows the court to grant "good-cause continuances" when either the "prisoner or his counsel" is present. *Hill.*

In this case, Matthews only agreed to a specified delay in trial, that is, until March 10, 2003. An order was entered continuing the trial until March 17, 2003, but there is nothing in the record to support that it was granted for good cause or that either the prisoner or his counsel was present when that determination was made.

 Returning to the central issue, after careful consideration of the three approaches taken by other jurisdictions, we are persuaded that the first approach is the better way to proceed. Article IV affords the prisoner certain procedural and substantive rights. *See United States v. Mauro,* 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978). These rights may be waived, however, when the prisoner makes

an affirmative request to be treated in a manner contrary to the procedures prescribed by Article IV. *Yellen, supra; Eaddy, supra; York, supra.* Here, Matthews completed an IAD form on October 10, 2002, expressly requesting disposition under Article III. Such affirmative action on his part clearly constituted a waiver of any rights he may have had as the result of the state's Article IV request on September 30, 2002. *Yellen; Eaddy; York.*

We must observe that the United States Court of Appeals for the Sixth Circuit held in *Eaddy* that if "a prisoner is aware of and understands the provisions of [the IAD], as well as his rights thereunder, a prisoner can waive those rights, so long as the waiver is voluntary." *Id.* at 344. Matthews contends that there is no evidence in the record which demonstrates that the waiver was knowing and voluntary. The 6th circuit also stated, however, that a prisoner may waive his IAD rights, even though he is not aware of those rights, "where there is an affirmative request to be treated in a manner contrary to the procedures." *Id.* Here, Matthews made an affirmative request to be treated in a manner contrary to the procedures in Article IV when he sought disposition under Article III. Accordingly, we hold that the Commonwealth had one hundred eighty days from October 10, 2002, within which to bring Matthews to trial and that such requirement was satisfied in this case. The trial judge did not err in overruling the motion to dismiss.

## II. Prosecutorial Misconduct

█ Matthews makes an assertion of prosecutorial misconduct based on his allegation that the prosecutor lied to the court about which party was the first to file under the IAD. When evaluating claims of prosecutorial misconduct, the appellate court must focus on the overall fairness of the trial and not the culpability of the prosecutor. *Slaughter v. Commonwealth,* 744 S.W.2d 407 (Ky.1987). The relevant inquiry is whether the conduct of the prosecutor was of such an egregious nature as to deny the accused his constitutional right of due process. *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

Here, there is no credible evidence in the record that the prosecutor deliberately lied or misled the court in who filed first under the IAD. Although the record is now clear that the Commonwealth filed first, this fact did not impact the overall fairness of the trial and did not deny Matthews his constitutional right of due process.

Matthews also claims that the Commonwealth made three offensive statements during the persistent felony offender penalty phase. He concedes that no objection was made to any of the statements, but seeks review pursuant to RCr 10.26.

█ The first statement complained of by Matthews was as follows: "The misdemeanor sentences you gave the defendant have no meaning under the law." Matthews also complains of this statement: "If you give him life, he is parole eligible as a PFO after ten years. It really has no meaning that 20—life. It really has no meaning that 20—life other than he may end up serving that 20 years to life but he is parole eligible at least at 10 years."

The first statement has been taken out of context. The prosecutor continued by explaining that the misdemeanor sentences have no meaning because they will run concurrent with the felony sentences. The second statement was attempting to explain when Matthews would be eligible for parole. Neither of these statements diminished the role of the jury in this case and neither constitutes palpable error.

■ Finally, Matthews finds fault with this statement: "He has committed more crimes than what you have already seen the record of." We must agree that the statement was inappropriate. However, this isolated comment certainly does not rise to the level of palpable error. Matthews received a fair trial and was not denied any of his due process rights.

### III. Evidentiary Hearing

■ Matthews argues that the trial judge abused his discretion by failing to hold an evidentiary hearing on the IAD issue. He contends that he presented the trial judge with evidence that the Commonwealth filed first under the IAD and that Illinois responded to that request. Matthews concedes that this issue is not preserved for appeal, but maintains that the error is palpable.

This argument has no merit. Under the approach adopted by this Court, it is irrelevant that the state filed first. Further, there was no requirement for the trial judge to hold a hearing on this matter. Thus, there could be no palpable error.

### IV. Ineffective Assistance of Counsel

■ Matthews asserts that his defense counsel was ineffective for failing to object to the prosecutor's remarks during closing argument, the IAD violations, and to request an evidentiary hearing on the IAD. We decline to address this issue on direct appeal. *See Humphrey v. Commonwealth,* 962 S.W.2d 870 (Ky.1998).

### V. Confession

Matthews claims that the trial judge erred by failing to suppress his confession. We disagree.

The trial judge held a hearing on the motion to suppress and the two police detectives that interviewed Matthews were the only witnesses that testified. Follow-ing the hearing, the trial judge made findings of fact and conclusions of law and ordered that the statements given to the first detective be suppressed, but, pursuant to *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), he allowed the statements given to the second detective wherein Matthews admitted his involvement in illegal methamphetamine activity.

The following is a summary of the findings of fact made by the trial judge: Approximately one hour after his arrest, the defendant was first questioned by a police detective and invoked his right to remain silent. After being told that his conversation was not being recorded, the defendant began speaking with the detective. The defendant admitted smoking marijuana that evening, but denied that the methamphetamine lab was his. Contrary to what he had been told, all of the defendant's statements were videotaped and audio taped by the police.

Some four hours after the questioning by the first detective ceased, the defendant was re-approached by a second detective and was asked if he would answer questions. Matthews denied any responsibility for the methamphetamine lab in the car, but when told he was going to be charged with manufacturing based on other evidence gathered, he began to change his story. The detective read Matthews his Miranda warnings, and told the defendant if he were to give a statement, he would be waiving those rights. The defendant stated that he understood and would talk. He then gave a taped confession to knowingly transporting the methamphetamine lab found in his car and attempting to evade a police officer who had chased him.

Whenever the defendant asked, the two detectives provided the defendant with drinks, allowed him to use the bathroom,

allowed him to smoke, and brought him food. The defendant's statement to the second detective after his Miranda warnings were read to him was a knowing, voluntary and valid waiver of his right to remain silent. The statement was an attempt to talk his way out of trouble after he learned he would be charged with manufacturing methamphetamine.

■ Our review of the record indicates that the findings of the trial judge are supported by substantial evidence, and thus are conclusive. RCr 9.78. Further, the trial judge correctly concluded from the record that Matthew's statement to the second detective was admissible pursuant to *Mosley, supra.* In that case, the U.S. Supreme Court held that the police may question a defendant after he has initially asserted his right to remain silent, provided they have not attempted to talk him out of asserting his privilege, and provided a time lapse occurs between his initial assertion of his privilege and a subsequent questioning. Here, the police did not attempt to talk Matthews out of asserting his privilege and six hours elapsed between his initial assertion of his privilege and his subsequent questioning by the second detective. The questioning of Matthews by police was proper.

■ Matthew's confession was voluntary. Viewing the taped confession in its entirety, there is no evidence of police coercion of a confession obtained by physical violence or a deliberate means calculated to break the will of Matthews. *See Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). As correctly found by the trial judge, Matthew's statement was his attempt to talk himself out of trouble.

■ The deception employed by the police was not coercive, nor could it have overborne Matthew's will. The mere employment of a ruse, or "strategic deception," does not render a confession involuntary so long as the ploy does not rise to the level of compulsion or coercion. *Illinois v. Perkins,* 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990). Matthews may not have made incriminating statements to the detectives if he had known the conversation was being recorded, but his ignorance of the concealed recording system could hardly have compelled him to confess.

■ The question of whether a defendant has voluntarily waived his Miranda rights is analyzed somewhat differently than the question of whether the underlying confession is voluntary. In order for a confession obtained by state action to be admissible, the Commonwealth only needs to prove a waiver of Miranda rights by a preponderance of the evidence. A statement is not compelled for Fifth Amendment purposes if an individual voluntarily, knowingly and intelligently waives his constitutional privilege. *Colorado v. Spring,* 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987); *Mills v. Commonwealth,* 996 S.W.2d 473 (Ky.1999).

■ The inquiry of whether a waiver is coerced "has two distinct dimensions." *Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986): First, the relinquishment of the right by the defendant must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. *Id.* at 421, 106 S.Ct. at 1141. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Id.* Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude

that the Miranda rights have been waived by the defendant. *Id. (quoting Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979)).

As to the first prong of the inquiry, the record does not demonstrate any credible evidence of police coercion. Therefore, we must conclude that Matthews voluntarily waived his Fifth Amendment privilege. Considering the second prong of the inquiry, the record reveals that Matthews was read his Miranda rights and was fully aware of the nature and consequences of abandoning his rights. Based on the totality of the circumstances, it is clear that Matthews waived his Miranda rights. The trial judge did not err in denying the motion to suppress the statement by Matthews given to the second detective.

## VI. Manufacturing Methamphetamine

Matthews argues that the trial judge erred to his substantial detriment by instructing the jury on the manufacture of methamphetamine. He claims that the trial judge should have directed a verdict on this issue because the Commonwealth failed to prove he possessed all the chemicals or equipment. (Matthews was prosecuted under KRS 218A.1432(1)(b) as opposed to subsection (1)(a) of that statute.) Specifically, he asserts the officers did not find anhydrous ammonia or lithium batteries. We disagree.

According to a police detective, Matthews admitted that the container recovered from the scene was methamphetamine that was cooking. Contrary to the claim by Matthews, this was not the only evidence of the presence of the two disputed ingredients. A police officer who responded to the scene testified that the container that was dropped during the pursuit was smoking and had a strong smell of ammonia. Further, a state crime lab technician stated that when he opened the sample sent to him, it had a strong ammonia smell. This was sufficient evidence that ammonia was present and used to manufacture methamphetamine. *See Varble v. Commonwealth,* 125 S.W.3d 246 (Ky.2004).

As to the lithium, the lead detective was shown a videotape of the crime scene where he had been present and specifically identified the dark strips on the bubbling container as the lithium. Interestingly, the lab technician was shown an inventory list at trial from American Enviro–Services, Inc., which had cleaned up the site on the night in question. He examined the list and said that it contained everything to make methamphetamine by the Nazi method except for the lithium batteries. However, our examination of the document shows that among other items on the inventory, the fifth line reads: Anhydrous Ammonia, L [or possibly Li], pill dough (cooking). A key at the bottom of the document reveals that L is an abbreviation for Lithium. Matthews clearly possessed the lithium.

After careful review of the record, we find that there was sufficient evidence that Matthews possessed all the chemicals necessary to manufacture methamphetamine. The trial judge properly denied the motion for a directed verdict.

## VII. *Faretta* Hearing

We next address the issue raised in Matthew's supplemental brief. He contends that the trial judge erred to his substantial detriment by failing to hold a *Faretta* hearing, *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), before making him co-counsel in this case. We disagree.

Prior to trial, Matthews filed a pro se motion to dismiss based on the Common-

wealth's alleged violation of the IAD. The trial judge overruled the motion, stating that the defendant had counsel and counsel had to file the motion. At a hearing in March, the defendant asked why he could not file his own motions and the trial judge informed him he had not asked to be made co-counsel. Matthews inquired how to be made co-counsel and the trial judge told him to ask. The defendant did and the trial judge granted the request, stating, "it is as simple as that." No hearing was held on the issue.

In *Hill v. Commonwealth*, 125 S.W.3d 221 (Ky.2004), a majority of this Court determined that a trial judge's "Faretta duties" in response to a defendant's waiver of counsel manifest themselves in three concrete ways: (1) the trial judge must hold a hearing in which the defendant testifies on the question of whether the waiver is voluntary, knowing, and intelligent; (2) during the hearing, the trial judge must warn the defendant of the hazards arising from and the benefits relinquished by waiving counsel; and (3) the trial judge must make a finding on the record that the waiver is knowing, intelligent, and voluntary. The waiver of counsel is ineffective unless all three requirements are met. The majority also held that the accused need not proceed completely pro se in order to trigger the trial judge's *Faretta* duties.

Under the circumstances presented here, *Faretta, supra,* and *Hill, supra,* have no application. Unlike the defendants in *Hill, Faretta,* and similar cases, Matthews did not participate as counsel at trial in front of the jury. He did not ask questions of the witnesses nor did he make opening or closing statements. His only participation upon being made co-counsel was to file pro se motions and, like other defendants, confer with his counsel. Matthews never waived his right to counsel in any manner. No *Faretta* hearing was required in this circumstance.

Finally, we have considered the issues in Matthew's pro se supplemental brief and find no additional merit in his arguments. His ineffective assistance of counsel claim is better considered in an RCr 11.42 motion. Matthews was not denied any of his due process rights under the federal or state constitutions. He received a fair trial.

The judgment of conviction is affirmed.

All concur.